# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2022-1163
_____

ISAAIH X. ASH,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

_____


On appeal from the Circuit Court for Columbia County.
Leandra G. Johnson, Judge.

February 26, 2025


WINOKUR, J.

Isaaih Ash ("Ash") appeals his conviction and sentence for attempted armed robbery with a firearm. Ash represented himself throughout most of his trial. After the verdict, however, he withdrew his request to proceed *pro se*. On appeal, Ash claims that the lower court coerced him into doing so. Expressed in Sixth Amendment terms, Ash argues that the trial court's efforts to protect his right to court-appointed counsel went too far and caused him to abandon his right to self-representation. The State argues that Ash was only playing games—exercising his right to self-representation so that he could "cause delay." We agree with Ash in part—finding that Ash's post-verdict relinquishment of his right to self-representation was a direct result of undue pressure

exerted by the lower court. Therefore, we reverse and remand for a new sentencing proceeding.

## I.

In the opinion that follows, we discuss why a trial court must strike an appropriate balance between the competing Sixth Amendment rights at issue in this case. Then, we address the ways in which the lower court impermissibly interfered with Ash's right to self-representation. Specifically, we discuss how the trial court:

- Unnecessarily conducted at least 14 *Faretta*[1] inquiries;
- Asked irrelevant and improper questions regarding Ash's technical competence to represent himself; and
- Improperly told Ash on at least 13 occasions that he lacked the technical competence to proceed *pro se*.

## II.

## A.

The Sixth Amendment provides criminal defendants with a right to court-appointed counsel as well as a right to self-representation. *See Faretta*, 422 U.S. at 807; *see also Slinger v. State*, 219 So. 3d 163, 164 (Fla. 5th DCA 2017) ("In addition to guaranteeing an accused person representation by appointed counsel, the Sixth Amendment protects a defendant's right to represent himself or herself."). The dignity of the individual forms the basis for a defendant's right to self-representation. *See Martinez v. Ct. of Appeal of California, Fourth App. Dist.*, 528 U.S. 152, 160 (2000) (noting that the right to self-representation described in *Faretta* was "grounded in part in a respect for individual autonomy" (citing *Faretta*, 422 U.S. at 834)); *McKaskle v. Wiggins*, 465 U.S. 168, 176-77 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused . . . .").

---

[1] *Faretta v. California*, 422 U.S. 806 (1975).

Free to choose whether he or court-appointed counsel will present his defense at trial, an indigent criminal defendant is not a ward of the State. *See Faretta*, 422 U.S. at 819 ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense."); *Weaver v. Mass.*, 582 U.S. 286, 295 (2017) ("[The defendant's right to conduct his own defense] is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." (citing *Faretta*, 422 U.S. at 834)); *Indiana v. Edwards*, 554 U.S. 164, 186–87 (2008) (Scalia, J., dissenting) ("[T]he dignity at issue is the supreme human dignity of being master of one's fate rather than a ward of the State—the dignity of individual choice.").

However, a criminal defendant cannot exercise his right to court-appointed counsel and his right to self-representation at the same time; he must choose one or the other. *See Sheppard v. State*, 17 So. 3d 275, 279 (Fla. 2009) (noting that "a defendant has no Sixth Amendment right to simultaneously proceed pro se and with legal representation."); *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992) (noting that [r]epresentation by counsel and self-representation are mutually exclusive entitlements").

Because competing Sixth Amendment rights are involved, a *Faretta* inquiry is not an all-or-nothing matter where a defendant's only choice is whether to invoke or waive some right. Rather, a defendant must choose one of two options: invoke one right and waive a competing right; or waive the right and invoke the competing one. *See United States v. Singleton*, 107 F.3d 1091, 1096 (4th Cir. 1997) ("[C]ourts have assumed that the right to self-representation and the right to representation by counsel, while independent, are essentially inverse aspects of the Sixth Amendment and thus that assertion of one constitutes a de facto waiver of the other.").

Consequently, a proper *Faretta* inquiry must balance the right to court-appointed counsel with the right to self-representation. *See Knight v. State*, 770 So. 2d 663, 665 (Fla. 2000) ("There is a delicate balance between a defendant's right to counsel and the right to self-representation."); *Fields v. Murray*, 49 F.3d 1024, 1029 (4th Cir. 1995) ("A trial court evaluating a defendant's request to

represent himself must 'traverse . . . a thin line' between improperly allowing the defendant to proceed *pro se*, thereby violating his right to counsel, and improperly having the defendant proceed with counsel, thereby violating his right to self-representation." (quoting *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990))). When striking that balance, "the defendant is entitled to choose [between the right to court-appointed counsel and the right to self-representation] without a thumb on the scale[.]" *See Cain*, 972 F.2d at 750.

*Faretta* states that a defendant can only waive the right to court-appointed counsel if he makes that decision "with eyes open"—having been made aware of the dangers and disadvantages of self-representation. *See Faretta*, 422 U.S. at 835. However, "[i]f the judge exaggerates either the advantages of being represented or the disadvantages of self-representation, he will be accused of having put his thumb on the scale and prevented the defendant from making an informed choice." *See United States v. Oreye*, 263 F.3d 669, 672 (7th Cir. 2001); *see also* Mark C. Milton, *Why Fools Choose to Be Fools: A Look at What Compels Indigent Criminal Defendants to Choose Self-Representation*, 54 St. Louis U. L.J. 385, 400 (2009) ("Whether *Faretta's* insistence that defendants 'should' be made aware of the dangers of self-representation requires that trial courts provide an explicit warning to defendants prior to allowing them to elect self-representation has been the subject of much debate. All courts seem to recognize that the dicta in *Faretta* asks trial courts to strike a delicate balance between: 1) serving as a counselor to defendants by advising them of the potential pitfalls of self-representation, and 2) overemphasis of the disadvantages of self-representation, thereby scaring an otherwise pro se prone defendant into acquiescing to court-appointed counsel." (footnotes omitted)).

Furthermore, judicial probing into the defendant's background and experience runs the risk of delving into irrelevant areas of technical competence. *See Faretta*, 422 U.S. at 836 ("[H]is technical legal knowledge, as such, was *not relevant* to an assessment of his knowing exercise of the right to defend himself." (emphasis supplied)); *see also Noetzel v. State*, 328 So. 3d 933, 949 (Fla. 2021) ("[T]he technical skill of a criminal defendant to represent himself is not part of the *Faretta* inquiry . . . .").

To the extent Florida Rule of Criminal Procedure 3.111 requires a "thorough inquiry . . . into both the accused's comprehension of [the] offer [of counsel] and the accused's capacity to make a knowing and intelligent waiver," Fla. R. Crim. P. 3.111(d)(2), a simple colloquy is sufficient. *See United States v. Hill*, 252 F.3d 919, 928 (7th Cir. 2001) ("All a judge can do as a practical matter—all a judge need do as a legal matter—is ensure that the defendant knows his rights and avoids hasty decisions."); *Potts v. State*, 718 So. 2d 757, 760 (Fla. 1998) ("In assessing the validity of a waiver of counsel, a reviewing court should focus not on the specific advice rendered by the trial court—for there are no 'magic words' under *Faretta*—but rather on the defendant's general understanding of his or her rights[.]" (emphasis supplied)).

The Supreme Court of Florida reiterated this point in two recent cases. In 2019, the Court stated that "the ability to prepare a competent legal defense and technical legal knowledge (or lack thereof) are not relevant issues in a self-representation inquiry and that a reviewing court should not "'focus' on the particular advice rendered by the trial court, but instead will evaluate the defendant's general understanding of his or her rights." *Hooks v. State*, 286 So. 3d 163, 168 (Fla. 2019) (internal quotation marks and citations omitted). Then, in 2021, the Court stated that "once a court determines that a competent defendant of his or own free will has 'knowingly and intelligently' waived the right to counsel, the dictates of *Faretta* are satisfied, the inquiry is over, and the defendant may proceed unrepresented." *Noetzel*, 328 So. 3d at 948 (internal quotation marks and citations omitted).

## B.

In this case, Ash endured at least fourteen *Faretta* inquiries. Because the judge never identified anything that called into question the original *Faretta* inquiry, thirteen of those were unnecessary. *See Noetzel*, 328 So. 3d at 951–52 ("[A]bsent a substantial change in circumstances that would cause the trial court to question its original ruling on the defendant's request for self-representation, there is no concomitant requirement to revisit *Faretta* every time the offer of counsel is subsequently renewed and rejected; *Woodbury v. State*, 320 So. 3d 631, 647 n.7 (Fla. 2021)

5

("We do not suggest that all of these [renewed] offers [of counsel] and *Faretta* inquiries were legally required . . . Nothing in the record suggests that any of the inquiries were prompted by new concerns about [the defendant's] behavior or competency.").

Some of the *Faretta* inquiries in this case were just days apart; and on two occasions, Ash was subjected to multiple inquires on the same day. Dates of the known *Faretta* inquiries are as follows:

- February 5, 2020.
- April 8, 2021.
- April 12, 2021 #1.
- April 12, 2021 #2.
- June 14, 2021.
- June 28, 2021.
- November 29, 2021.
- December 6, 2021.
- March 18, 2022.
- March 21, 2022.
- March 22, 2022 #1.
- March 22, 2022 #2.
- March 22, 2022 #3.
- April 11, 2022.

Ash objected to the multiple *Faretta* inquiries during his trial. The following comments during the June 28, 2021, inquiry show the nature of those objections:

- "Your Honor, I have a question. This isn't a *Faretta* Hearing or *Faretta* Inquiry, so why are we – I understand that you have to go back over the fact that I'm representing myself, *but why do you keep asserting the fact over and over and over and repeatedly? I already advised that I want to represent myself.*"
- "But if all of that was conducted in the *Faretta* Inquiry, *why would we keep going over it when it's already been established?*"
- "Yes, Your Honor, *we have went over the fact that I only made it to 11th grade,* Your Honor."

(Emphases supplied).

During a *Faretta* inquiry on March 18, 2022, Ash once again highlighted the repetitive nature of the court's questions:

> THE COURT: All right. And, Mr. Ash, you know, I know that you may think that I'm repeating myself, but I'm required under the law to, to conduct the *Faretta* inquiry to make certain that you fully understand how dangerous it is to represent yourself. And I know that the last time that we conducted such an inquiry, you had told me that you have an eleventh-grade education; is that correct?
> THE DEFENDANT: Yes, Your Honor, *that's stated on the record*.
> THE COURT: Yes, sir. And, and so you don't have any legal training, other than what you have taught yourself; is that correct?
> THE DEFENDANT: Of course, Your Honor, *that's stated on the record*.

(Emphases supplied).

And just three days later on March 21, 2022, Ash iterated that his answers to the trial court's questions were already "stated on the record":

> THE COURT: And you have told me previously that you have an 11th grade education, is that correct?
> THE DEFENDANT: Yes, Your Honor, *stated on the record*.

(Emphasis supplied).

One could suspect that the trial court conducted all those inquires to comply with this Court's decision in *Howard v. State*, 147 So. 3d 1040 (Fla. 1st DCA 2014), even though the Supreme Court of Florida recently rejected *Howard*. *See Noetzel*, 328 So. 3d at 952 n.9 ("To the extent the First District Court of Appeal held to the contrary in [*Howard*], when it stated (emphasis ours) that '[f]ailure to renew the offer of counsel at a critical stage and

7

conduct a *Faretta* inquiry if the defendant rejects the renewed offer is per se reversible error,' we disapprove *Howard*.").

Whatever the lower court's motivations, the repeated *Faretta* inquiries support Ash's claim that he was coerced into abandoning his right of self-representation. *See United States v. Underwood*, 88 F.4th 705, 709 (7th Cir. 2023) ("On the one hand, [i]f a *Faretta* colloquy is too cursory, it may be insufficient to guard against an unknowing waiver of the right to counsel. On the other hand, if the colloquy is too exacting, it risks depriving the defendant of his right to represent himself *by relentless questioning that ultimately causes the defendant to give up the right he sought to exercise*." (emphasis supplied) (citations omitted)).

C.

In addition to the problematic number of *Faretta* inquiries in this case, the judge repeatedly asked Ash irrelevant and improper questions regarding his technical competence to represent himself. *See McKenzie v. State*, 29 So. 3d 272, 282 (Fla. 2010) ("[T]he ability to prepare a competent legal defense and technical legal knowledge (or lack thereof) are *not* relevant issues in a self-representation inquiry."); *Marquardt v. State*, 156 So. 3d 464, 483 (Fla. 2015) ("Although a defendant ordinarily will lack the skill to conduct the trial as neatly and competently as an attorney, this does not circumscribe the right of self-representation." (citations omitted)); *Weaver v. State*, 894 So. 2d 178, 193 (Fla. 2004) ("The focus of a *Faretta* hearing under rule 3.111 is whether a defendant is competent to waive the right to counsel, *not* whether he is competent to provide an adequate defense.").

The following examples, taken from a single *Faretta* inquiry on April 8, 2021, illustrate the improper scope of the trial judge's questions:

- "[D]o you know what a voir dire process means?"
- "Do you know what you have to do to select a jury?"
- "Have you studied [the Florida] Rules of Criminal Procedure?"
- "[H]ow many persons would be on, on the jury?"

- "And do you know how many peremptory challenges you'd be entitled to have?"
- "Do you know how many challenges for cause you would have?"
- "Do you know what happens after jury selection; what is the next step?"
- "But do you know the difference between an opening statement and a closing argument during trial?"
- "Do you know what direct examination of a witness is?"
- "Do you know what cross-examination is?"
- "Do you know the Rules of Evidence in the state of Florida?"
- "Do you know what – how to make an objection in court?"
- "Do you know [how to properly preserve errors for appellate review]?"
- "[D]o you know what jury instructions are?"

These questions were irrelevant and improper. *See Hooks*, 286 So. 3d at 169 ("[T]he defendant's understanding of the rules of criminal procedure—is only relevant if assessing the accused's 'technical legal knowledge.' . . . [T]his is clearly an improper consideration." (citations omitted)); *Hill v. State*, 688 So. 2d 901, 905 (Fla. 1996) ("We emphasize that a defendant does not need to possess the technical legal knowledge of an attorney before being permitted to proceed pro se . . . . [T]he judge was not required to give Hill a lesson on how to try a lawsuit before finding that Hill was making a knowing waiver of his right to counsel. It was enough for Hill to be alerted generally to the difficulties of navigating the legal system, and in this case the inquiry went beyond the minimum requirements to warn Hill of the particular difficulty of laying a predicate for a defense.").

D.

Just as the trial court's questions regarding technical competence were irrelevant and improper, so too were the court's statements to Ash that he lacked the competence to represent himself. The thirteen times the lower court did so are outlined below:

- February 5, 2020 - "It would be a very bad mistake for you to try to represent yourself from inside the jail. But I can't keep you from doing that if you make a, what many judges say, is a foolish choice to represent yourself."
- April 8, 2021 - "[I]t's obvious that, to this Court, that you do not have the legal knowledge or training to be able to adequately represent yourself . . ."
- April 12, 2021 #1 - "[Y]ou're not competent, you don't have the legal competence to represent yourself because you don't have the knowledge, training, experience and education . . ."
- April 12, 2021 #2 - "[T]he Court makes a specific finding that while the defendant does not have the legal knowledge or training or experience to represent himself . . ."
- May 17, 2021 - "[T]he Court finds that while Mr. Ash certainly does not have the legal knowledge to represent himself . . ."
- June 14, 2021 - "[Y]ou certainly do not have the legal experience, you've not graduated from high school, and you don't have any type of legal training that other attorneys involved in the case do have . . ."
- June 28, 2021 - "[Y]ou are certainly not -- you do not have the legal knowledge to represent yourself . . ."
- November 29, 2021 - "[T]he Court finds that the defendant does not have the legal education nor the training to competently represent himself . . ."
- December 6, 2021 - "Because the Court has found previously that because of your age and lack of legal education, you certainly do not have the legal background to adequately represent yourself."
- March 18, 2022 - "And while the Court finds that you do not have the legal training and experience to properly represent yourself . . ."
- March 21, 2022 - "[Yo]u do not have the legal training and experience to represent yourself . . ."
- March 22, 2022 #1 - "So then the Court continues to find that while Mr. Ash does not have the educational background with only an 11th grade

10

education and no formal experience in the law, he does not have that legal background . . ."

- March 22, 2022 #2 - "[T]his Court finds you are not [competent to represent yourself] because of your lack of legal education . . ."

These statements support an argument that the lower court pressured Ash into electing court-appointed counsel. *See Hill*, 252 F.3d at 928–29 ("*Faretta* require[s] courts to respect a litigant's demand for self-determination at the most critical moment in the criminal process. That right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse.").

E.

Multiple times throughout Ash's trial, the trial court improperly asked Ash why he wanted to proceed pro se. Generally, a defendant's reasons for electing self-representation are irrelevant. *See Laramee v. State*, 90 So. 3d 341, 345 (Fla. 5th DCA 2012) ("[A] defendant need not articulate a reason to invoke his right of self-representation."); *Eib v. State*, 191 So. 3d 977, 979 (Fla. 2d DCA 2016) (quoting *Laramee*). The question may be appropriate when, for example, the defendant elects self-representation as a dilatory tactic, if the defendant's election suggests mental incompetence, or if the ineffective assistance of trial counsel caused the election. *See, e.g., Faretta*, 422 U.S. at 834 n.46 ("We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. . . . Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."

In this case, it remains unclear why the trial court questioned Ash's reasons for proceeding *pro se*. During several of the *Faretta* inquiries, Ash iterated that he did not want a court-appointed attorney to represent him. The trial court, in response, continually asked Ash to explain why he did not wish to be represented by counsel when he did not have the requisite legal knowledge to proceed himself. All those questions, regarding Ash's motivation to

11

proceed *pro se*, were improper in this case.[2] *See Laramee*, 90 So. 3d at 345.

F.

In this case, Ash initially invoked his right to self-representation on February 5, 2020. Ash proceeded *pro se* until the start of his first trial on April 12, 2021; after Ash requested court-appointed counsel, the trial court declared a mistrial. Then, on May 17, 2021, Ash elected once again to proceed *pro se*. That period of self-representation lasted until September 3, 2021; during a first appearance hearing on that day, Ash elected court-appointed counsel. On November 29, 2021, Ash exercised his right to self-representation. After the jury reached a verdict at his second trial on March 22, 2022, Ash chose court-appointed counsel. Finally, during a pre-sentencing hearing on April 11, 2022, Ash asserted his right to self-representation but withdrew his motion to proceed *pro se* after the fourteenth *Faretta* inquiry in this case.

Under the unique facts of this case, we find that the third *Faretta* inquiry conducted on March 22, 2022, is the straw that broke the camel's back. *See Hill*, 252 F.3d at 929 ("A defendant bullied or frightened into acquiescing in a lawyer that he would rather do without would be in a much better position to say that the choice was not made knowingly or intelligently.").

By our count, that was the thirteenth *Faretta* inquiry Ash endured in this case; and it was the thirteenth time that the trial court told Ash that he lacked the technical competence to represent himself. At that point, we find that Ash was coerced into accepting court-appointed counsel. *Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 137 (1st Cir. 1985) ("A necessary part of the right of self-representation is that a litigant . . . cannot be coerced into accepting appointed counsel rather than proceeding *pro se*.").

---

[2] The trial court conducted numerous *Nelson* inquiries in this case and determined each time that court-appointed counsel had not rendered ineffective assistance. *See Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973).

12

Because the error in this case is structural, no showing of prejudice is required; therefore, we conduct no harmless error analysis. *See Weaver*, 582 U.S. at 295 ("Because harm is irrelevant to the basis underlying the right [to self-representation], the Court has deemed a violation of that right structural error." (citation omitted)); *see also McKaskle*, 465 U.S. at 177 n.8 ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless.").

## III.

The State argues that Ash did not withdraw his request for self-representation because he felt coerced by the trial judge to do so. According to the State, Ash was only playing games—exercising his right to self-representation so that he could "cause delay." For support, the State points to a hearing on April 8, 2021, during which the prosecutor argued (based on recorded jail conversations that are not part of the record on appeal) that Ash planned all along to withdraw his request for self-representation *before trial*:

> He did articulate on the phone, he says, "Worst case scenario comes, I'm going to get a conflict attorney, but like I keep saying, it's not going to go that far because I put in a new motion that's going to pause the whole case and get the judge off the case," referring to Judge Bryan, "the new judge will have to review everything that happened of the past 14 months de novo."
>
> And then with regard to whether he would have a trial without counsel, he said, "I'm not going to let it go that far. I'm not going to let it go that far."

That proved to be untrue, however, as Ash represented himself through the verdict in his re-trial. Furthermore, the

prosecutor's comments are not evidence.[2] *See State v. Dixon*, 308 So. 3d 1121, 1124 (Fla. 2d DCA 2020) ("The fact that the prosecutor informed the trial court that the loss prevention officer had arrived at the $1,839.56 amount after reviewing two weeks of surveillance footage is not dispositive. *The prosecutor's comments are not evidence.*" (emphasis supplied)).

To the extent the State claims that Ash forfeited his right to self-representation, the trial court made no finding that Ash engaged in a disorderly, disruptive, or disrespectful manner. And while we do not address whether specific warnings are required before a defendant can lose the right to self-representation, we note that no such warnings were given in this case. *Cf. Illinois v. Allen*, 397 U.S. 337, 343 (1970) ("[W]e explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."); *see also Faretta*, 422 U.S. at 834 n.46 (citing *Allen*, 397 U.S. at 337)).

IV.

We view the *Faretta* inquiries in this case from the perspective of the defendant, not the trial court. *Cf. McKaskle*, 465 U.S. at 179 ("From the defendant's own point of view, the right to appear *pro se* can lose much of its importance if only the lawyers in the courtroom know that the right is being exercised."). While a trial court acts properly in ensuring that a defendant understands the dangers and disadvantages of self-representation, we cannot ignore that self-representation is a defendant's constitutional right. By the end of the third *Faretta* inquiry on March 22, 2022 (at least the thirteenth such inquiry in this case), the cumulative effect of the trial court's questions and comments had become

---

[2] The trial court instructed the prosecutor to file a copy of Ash's telephone conversation. However, it does not appear that the prosecutor did so as the record on appeal does not contain a transcript or any other account of that conversation.

14

coercive. Therefore, we reverse and remand for a new sentencing proceeding.

B.L. THOMAS, J., concurs; LONG, J., dissents with opinion.

––––––––––––––––––––––––––––

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

––––––––––––––––––––––––––––

LONG, J., dissenting.

In support of its decision today, the majority has discovered a new constitutional principle hidden in the text of the 233-year-old Sixth Amendment. It then imposes this new principle without any discussion of the constitutional text, its original meaning, or its application in history and tradition. I must dissent.

### I. The Faretta Landscape

*Faretta* held that criminal defendants have a right to self-representation. Today's decision extends *Faretta* to create a new amorphous legal principle that a court can "coerce" a defendant into waiving his right to self-representation, even while allowing him to self-represent. We have never said that, and that is not what *Faretta* says. The majority provides no guidance for where this new coercion principle will start and stop. It fails to explain how the principle will relate to existing law. And it gives no instruction on how it should be applied by trial courts. It simply makes a pronouncement and leaves the difficult work of making sense of it for later. But as we will see, this rubber-meets-the-road business will be difficult. Because not only is the new principle created from whole cloth, but it also conflicts with the existing *Faretta* landscape.

In *Faretta,* the trial court *prohibited* Faretta from representing himself. *Faretta v. California*, 422 U.S. 806, 809–11 (1975). In response, the Supreme Court pronounced that the Sixth Amendment implies a right to self-representation. *Id.* at 821. It found that the Sixth Amendment "when naturally read . . . implies

15

a right of self-representation" and that this was "reinforced by the Amendment's roots in English legal history." *Id.* There is dispute about how much support can be found for the right in history and tradition. But the right is undisputedly not found in the text of the Constitution. The Sixth Amendment says:

> *In all criminal prosecutions, the accused shall enjoy the right* to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and *to have the Assistance of Counsel for his defence.*

U.S. Const. amend. VI (emphasis supplied).[1] And so the Constitution contains an express right to counsel, but no express right to self-representation. As we embark on expanding this unenumerated right into new territory, the *Faretta* dissents offer words of caution:

> The most striking feature of the Court's opinion is that it devotes so little discussion to the matter which it concedes is the core of the decision, that is, discerning an independent basis in the Constitution for the supposed right to represent oneself in a criminal trial. Its ultimate assertion that such a right is tucked between the lines of the Sixth Amendment is contradicted by the Amendment's language and its consistent judicial interpretation.

*Faretta*, 422 U.S. at 837 (Burger, C.J., dissenting) (footnote omitted) (citations omitted). Justice Blackmun's dissent is also noteworthy: "I find no textual support for this conclusion in the language of the Sixth Amendment. I find the historical evidence

---

[1] When adopted, the Sixth Amendment applied only to the federal government. I do not intend here to speak to the merits of the Incorporation Doctrine.

relied upon by the Court to be unpersuasive," and presciently, "I fear that the right to self-representation constitutionalized today frequently will cause procedural confusion without advancing any significant strategic interest of the defendant." *Id.* at 846 (Blackmun, J., dissenting).

There is nothing in the Sixth Amendment, *Faretta*, or the known history and tradition that suggests a trial court must limit the number of times a defendant is told about his rights. The decision today not only strays from the text of the Constitution, it stands in conflict with the broad body of *Faretta* jurisprudence. *Faretta* itself requires trial courts to (1) inform defendants about the right to counsel, (2) explain the "dangers and disadvantages of self-representation," and (3) ensure that the defendant "'knows what he is doing and his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942)). The *Faretta* inquiry must be covered with a self-representing defendant at every "critical stage" of the prosecution. *Woodbury v. State*, 320 So. 3d 631, 650–51 (Fla. 2021); *Muehleman v. State*, 3 So. 3d 1149, 1156 (Fla. 2009) ("'[T]he waiver applies only to the present stage and must be renewed at each subsequent crucial stage where the defendant is unrepresented.'" (quoting *Traylor v. State*, 596 So. 2d 957, 968 (Fla. 1992))); *see also* Fla. R. Crim. P. 3.111(d)(5) ("If a waiver is accepted at any stage of the proceedings, the offer of assistance of counsel shall be renewed by the court at each subsequent stage of the proceedings at which the defendant appears without counsel."). A critical stage is any hearing that could result in "significant consequences for the accused." *Bell v. Cone*, 535 U.S. 685, 696 (2002). This includes every time the trial court takes up a substantive motion that "may significantly affect the outcome of the proceedings." *Traylor*, 596 So. 2d at 968.

Nothing supports the proposition that engaging in the *Faretta* inquiry process too often or when it is not required can amount to reversible error. Similarly, nothing supports the proposition that a *Faretta* inquiry can be too thorough—so thorough, the majority contends, as to be an error of constitutional proportions. With no support for the central basis of reversal, our inquiry should end. But even if it were possible to unconstitutionally coerce a defendant into waiving self-representation by the quantity or

17

content of *Faretta* inquiries, reversal here would still not be warranted.

## II. Application to Ash

The majority reverses by assembling the trial court's purported error into three categories: (1) unnecessary *Faretta* inquiries, (2) improper questions about Ash's technical competence, and (3) informing Ash that he lacked the technical competence for effective self-representation.

Before we consider these categories, let us first examine the circumstances that brought us here. Ash was a juvenile when he committed the crime but was charged and tried as an adult. He was seventeen at the beginning of the case and had turned twenty by its conclusion. In addition to being a teenager, Ash was a difficult pro se defendant. He was often uninformed, disruptive, and abusive. There is good reason to believe he was, at times, not proceeding in good faith. He repeatedly behaved badly in court, including speaking out of turn in front of the jury with statements like, "This shit is crazy." His behavior led the court to grant a mistrial in the first effort to try the case. He made preposterous and disruptive sovereign citizen claims. He submitted scores of frivolous filings, including frivolous writ petitions to this Court and the supreme court. This included, for example, vile filings repeatedly calling both presiding trial judges racists and saying the court "would rather see a monkey with a gold chain and a diamond ring [than] see a young black male with anything." Two judges handled the case because one recused after repeated personal attacks. Ultimately, Judge Leandra Johnson landed the plane. The record reflects that Judge Johnson was extremely patient with Ash. Ash repeatedly tried to subpoena her and call her as a witness in the trial. In open court, Ash called Judge Johnson evil, malicious, and vindictive. He repeatedly made baseless objections, disrupting the proceedings. Despite this abuse, Judge Johnson engaged with Ash in a respectful and dignified manner. And through all of Ash's bad behavior, the trial court *never* prevented him from representing himself. We will cover the other circumstances in more detail below, but it is the last that controls this case—Ash was never prevented from

representing himself.  And you cannot violate *Faretta*'s right to self-representation except by prohibiting self-representation.

### *A. Necessity and Quantity of Inquiries*

Despite Ash's nearly two years of self-representation, the majority concludes the trial court conducted "unnecessary" *Faretta* inquiries.  The majority criticizes the proximity of the inquiries, noting, without discussion of the circumstances, that some were only days apart or within the same day.  But, as we will see, the trial court simply conducted *Faretta* inquiries before each substantive hearing and at each critical stage of the prosecution.  Rather than a coercive trial court, the quantity of inquiries flows from an extended, two-year pretrial period with multiple motion hearings and three attempts to try the case.

Because the majority seemingly relies on every inquiry to cumulatively establish an unconstitutional coercion, we will examine each in turn.  A thorough review of the record shows that both trial judges provided inquiries before motion hearings, before important pretrial case managements, before selecting the juries (in both trials), before the presentation of evidence, and before sentencing.  Not one was inappropriate.

The first *Faretta* inquiry was conducted on February 5, 2020, after a *Nelson*[2] hearing.  Ash had filed a pro se motion that his appointed counsel refused to adopt.  After the inquiry, Ash elected to represent himself.  From then on, Ash proceeded pro se until he requested counsel in the midst of his first trial.

Before Ash's first trial, the trial court renewed the offer of counsel seven times at hearings on October 28, 2020, November 25, 2020, December 9, 2020, December 16, 2020, January 6, 2021,

---

[2] *See Nelson v. State*, 274 So. 2d 256 (Fla. 4th DCA 1973) (prescribing that if a defendant seeks to discharge court-appointed counsel based on ineffectiveness, the trial court should inquire whether counsel is rendering ineffective assistance).

March 31, 2021, and April 8, 2021. These hearings covered a wide variety of, mostly frivolous, pro se filings, including writ petitions, motions to suppress, motions to dismiss, motions for adversarial preliminary hearings, discovery disputes, a motion "for reclassification of the offenses," a "notice of expiration," and a demand for copies of the oaths of office for the judges and prosecutor.

The majority criticizes the trial court for conducting two inquiries on April 12, 2021. But the circumstances fully justify both inquiries. Ash's first trial began that day. The trial court conducted the first inquiry just before jury selection. Ash then began interrupting the state's opening statement. He made several frivolous objections—for example, repeating that the court was not "showing equal protection" and arguing that the state could not discuss the expected evidence in opening because the evidence had not yet been presented. The court repeatedly overruled Ash and instructed him to stop repeating the same objections. He refused to comply and continued to disrupt the state's opening. He then, in the middle of the state's opening and in front of the jury, demanded he be appointed a lawyer. The trial court sent the jury out and conducted the second inquiry of the day. Ash then said he did not want the public defender and asked the court to appoint another attorney. The court, not for the first time, explained to Ash that while he could hire anyone he would like, he could not have his choice of appointed counsel. While the court attempted to explain this, Ash continued to interrupt. Ultimately, the court appointed the public defender. The public defender then explained that she was not prepared to try the case, and therefore, moved for a mistrial and a continuance. The trial court granted both.[3] So while the court conducted two inquiries on April 12, 2021, the record shows that both were appropriate.

The next inquiry was held on May 17, 2021, after Ash moved to discharge his newly appointed counsel. As a result, the court

_____

[3] Whether Ash was entitled to a mistrial under these circumstances is not an issue in this appeal.

held another *Nelson* hearing and then another *Faretta* inquiry. At the conclusion, the trial court again discharged appointed counsel and again permitted Ash to represent himself. The next inquiry was held on June 14, 2021, when the court took up several more pro se motions.

The next inquiry was held on June 28, 2021, at a pretrial conference for the second trial set to begin on July 12, 2021. The trial court explained that because this was the last hearing before the second trial started, the court was again offering appointed counsel. During this inquiry, the trial court explained that it was appointing the public defender as standby counsel to avoid delay in the event that Ash were to again request counsel in the middle of the trial. Ash requested to have an untimely, frivolous motion heard. Because he did not have a copy of his motion, he wanted the trial court to give him the court's copy. The trial court accommodated Ash by hearing his untimely motion and having the bailiff take the court's copy of the motion to Ash at counsel's table. Ash then complained that the court "keep[s] holding me to the standards of an attorney, I did not go to law school." Ash then engaged in an argumentative motion hearing, repeatedly interrupting the court and disagreeing with the court's rulings, all while the court patiently walked through each issue, attempting to explain the proceedings to Ash.

On July 12, 2021, when everyone was present to select the jury for the second trial, Ash failed to appear. A capias was issued to take him into custody. He was not brought back into custody until September 2, 2021. At first appearance, the public defender was again appointed to represent him.

The next inquiry was held on November 29, 2021, during a hearing on Ash's "motion for nelson inquiry." He again complained that appointed counsel would not adopt his pro se filings. Counsel refused to adopt them because they lacked legal merit. Ash then requested to represent himself. The court conducted another *Faretta* inquiry. Counsel was then discharged, and Ash was again permitted to represent himself.

21

The next inquiry occurred on December 6, 2021, after Ash filed an abusively frivolous motion seeking a subpoena to require the trial judge to appear as a trial witness.

On December 20, 2021, Ash came to court, but refused to participate in any proceedings. He repeatedly interrupted the judge, refused to acknowledge the court and its jurisdiction, and demanded a discharge of the charges. He then filled pages and pages of transcript with absurd sovereign citizen claims that are not worthy of our time to repeat here. *See Barber v. Bay Cnty. Sheriff's Off. Jail Facility*, 308 So. 3d 254, 254 (Fla. 1st DCA 2020) (explaining that sovereign citizen theories are "preposterous argument[s that are] an abuse of the courts" with "no basis in the law, and parties that make [them] are in danger of court sanctions"). Again, the trial judge patiently dealt with Ash and attempted to explain that the court intended to follow Florida law rather than his fantastical sovereign citizen wishcasting. Ash said, "I don't understand the laws. I don't understand them." Ash demanded the judge state her name for the record, refused to answer her questions, and then left the podium and went into the gallery. The judge politely asked Ash to return to the podium so they could address his case. He refused and spoke to the court from the gallery. Ash then, from the gallery, said, "The matter is adjourned, Your Honor," and he left the courtroom.

Ash then failed to appear for his next court date on January 3, 2022, and another capias was issued for him. Ash was arrested on the second failure to appear capias on January 20, 2022. The trial court reset the case for trial; this time, scheduled to begin on March 21, 2022. The next inquiry occurred on Friday, March 18, 2022, at the last hearing before the trial set to begin the following Monday. The next inquiry came on March 21, 2022, as a final opportunity to elect counsel before jury selection began. Ash chose, and he was permitted, to keep representing himself.

This brings us to March 22, 2022. The majority makes much of the three inquiries conducted that day. But again, the record shows that all three were justified. The day before, Ash had filed a document claiming that "Judge Leandra G. Johnson is indeed prejudice to Isaaih Xazavier Ash," that she has "a mental attidue of biasisness & maliciousness," and requesting a change of venue.

22

Before the court took up this new filing, which manifests a gross deficiency in legal competence, the court engaged in a *Faretta* inquiry where Ash was informed that the court would still appoint counsel if he wished. Ash continued his self-representation.

The second inquiry of the day came after Ash filed a "writ of mandamus for order of recusal" and a "notice" claiming he had a conflict of interest with standby counsel. As noted above, the court had appointed standby counsel to prevent delay if Ash again requested counsel in the middle of trial. The court, again, explained that, for now, Ash was not represented by counsel and that standby counsel was not his lawyer, but was only there to step in if he changed his mind about self-representation. Ash then said that he had "a fundamental right to request counsel." The court agreed, and asked if he was requesting to have counsel appointed. He said that he was. The court confirmed by asking if he was waiving his right to represent himself. Ash said, "I am waiving my right and I want counsel appointed." The court then appointed the public defender. Ash then immediately asked to have counsel discharged because "our interests are conflicting toward my case." The remarkably patient trial judge then set to work conducting another *Nelson* hearing. Ash then filled pages of transcript with rambling, frivolous argument. The trial court eventually found there was no conflict and declined to appoint a different lawyer. Ash then raised his hand and said, "at this time I would like to represent myself again." Then, despite this overt abuse of the process, the trial judge, uncomplaining, conducted the second *Faretta* inquiry of the day.[4]

---

[4] The supreme court has instructed that even where a criminal defendant deliberately uses his right to counsel to frustrate and delay his trial, the trial court still *must* conduct a *Faretta* inquiry before allowing a defendant to proceed without counsel. *State v. Young*, 626 So. 2d 655, 657 (Fla. 1993) (noting "the frustration of trial judges who are burdened with belligerent defendants who attempt to thwart the system in any way they can" but instructing that a trial court should still "confirm the waiver of assistance of counsel through a *Faretta* inquiry").

The next inquiry—which the majority condemns as the third of the day and holds to be a constitutional violation requiring reversal—came *after* the jury reached a verdict finding Ash guilty. Sentencing is a critical stage where another inquiry is typically required. *See Jackson v. State*, 983 So. 2d 562, 575 (Fla. 2008); *see also Gardner v. Florida*, 430 U.S. 349, 358 (1977) ("[S]entencing is a critical stage of the criminal proceeding."). The trial court explained to Ash that sentencing was a separate critical stage of the proceedings and that he was entitled to have counsel appointed to represent him for the next phase of the prosecution. Ash said he now wanted counsel appointed to represent him. The court appointed counsel for sentencing, set a sentencing date, and adjourned. While the majority holds this third inquiry of the day to be unconstitutional, conducting an inquiry that we have said is *required* cannot amount to a constitutional violation. *Henretty v. State*, 146 So. 3d 55, 56 (Fla. 1st DCA 2014) (holding that "[a] trial court *must* renew the offer of counsel at every critical stage of the proceedings, including . . . sentencing").

The final inquiry came on April 11, 2022. Seven days after his guilty verdict and having just requested that counsel be appointed for sentencing, Ash filed a "motion to discharge sentencing counsel." The court set the matter for hearing on April 11, 2022. At the hearing, the court sought to clarify whether Ash was claiming counsel was ineffective or if he wished to represent himself again. Ash said that he wanted to represent himself. Once again, the trial judge told Ash that he has "an absolute constitutional right" to self-representation. The judge then engaged in another routine *Faretta* inquiry. The court said that the purpose of the inquiry "is in no way to demean you or make you look bad." Instead, the court explained, "it's just that I'm required to point out to you that someone young of age, someone who does not have legal training is going to be at a disadvantage, in fact, at a great disadvantage at this other critical stage of the proceedings." After this final inquiry, Ash decided to keep appointed counsel.

This brings the inquiries to an end. The record reveals that each inquiry occurred before substantive hearings and important phases of the criminal prosecution. I agree that not all of them

were legally required, but none amounted to reversible error. Each informed the defendant both of his right to counsel and his "absolute constitutional right" to self-representation. After every inquiry, Ash was permitted to represent himself if he wished—even when his changing mind was disruptive and farcical. Despite all this, the majority opinion characterizes Ash as having "endured" "unnecessary" *Faretta* inquiries—as if Ash were victimized by the court telling him he had a right to a free lawyer. If anything, the record reflects that it was the trial court that endured Ash's abuse.

## B. Technical Competence

The majority also objects to the content of the *Faretta* inquiries. In particular, the trial court's questions and comments about Ash's technical competence to represent himself. The majority provides no example of any court, anywhere, reversing because a *Faretta* inquiry was *too* substantive. To the contrary, the vast body of *Faretta* law stands in stark conflict to today's decision.

We must first remember that the substance of the inquiry is governed by *Faretta* itself. It is true, as the majority points out, that a defendant's technical competence (i.e. education, legal training, etc.) are irrelevant when evaluating whether a defendant will be *permitted* to self-represent. But *Faretta* also requires trial courts to explain the "dangers and disadvantages of self-representation," and ensure that the defendant "'knows what he is doing and his choice is made with eyes open.'" *Id.* A discussion of the defendant's education and legal training is a natural part of that requirement. And trial courts have wide discretion to carry out this obligation. We discussed compliance with these requirements in *Hooks v. State*, 236 So. 3d 1122 (Fla. 1st DCA 2017).

*Hooks* approved the use of a written *Faretta* form covering the very topics the majority now finds "irrelevant and improper."[5] In

_____

[5] *Hooks* was later approved by the supreme court. *Hooks v. State*, 286 So. 3d 163 (Fla. 2019)

*Hooks*, the defendant was provided a form, with more than thirty statements detailing the right to counsel and to self-representation and outlining their advantages and disadvantages. The defendant had to initial and sign the form. *Id.* at 1127–28. The form cautioned, for example, that lawyers will help "[m]ake sure the state follows the proper rules for picking a jury," to "[o]bject and argue to the judge if the state does not follow rules of evidence," and that "[s]elf-representation is almost always unwise because . . . [the defendant] will have to follow the rules of criminal procedure and evidence, even though it takes years for a lawyer to learn these laws and rules." *Id.* Today's decision turns this on its head and holds that covering these same topics amounts to a constitutional error. While all of these topics may not be *required* for an adequate inquiry, they no doubt speak to the "dangers and disadvantages of self-representation," and are, therefore, well within the scope of an appropriate *Faretta* inquiry.

Trial courts around the state will be justifiably confused when they read that the questions we approved in *Hooks* are now reversibly "irrelevant and improper." But more important than our internal inconsistency, the decision runs against supreme court *Faretta* instruction. The supreme court made clear that there is more than one way to conduct an adequate *Faretta* inquiry. And because the trial court's *Faretta* inquiry "turns primarily on an assessment of demeanor and credibility, its decision is entitled to great weight." *Potts v. State*, 718 So. 2d 757, 759 (Fla. 1998). The supreme court also explained that "the right of self-representation is best safeguarded not by an arcane maze of magic words and reversible error traps, but by reason and common sense." *Id.* at 760. And that an appropriate inquiry "will vary depending on circumstances related to the defendant that are known to the trial judge." *Hooks*, 286 So. 3d at 169–70. A trial court is on firm ground to use the questions *we approved* to discuss the dangers of self-representation with a teenager. Even if not required, it remains good trial practice to provide a renewed *Faretta* advisement at each new proceeding to make sure the defendant knows the court is still willing to appoint him counsel. And it is reasonable for the trial court to give robust *Faretta* warnings to an erratic pro se teenager that is rejecting his right to counsel in a serious felony trial.

The majority also concludes that, while conducting these brief inquiries, the trial court erred by pointing out that Ash lacked the technical competence to effectively try a criminal case. But this, of course, was true. The trial court correctly noted that Ash was young (remember he committed this offense as a juvenile), had not graduated from high school, was not a trained lawyer, was unaware of basic trial court procedures, knew little of the law, did not know how to select a jury, and was unfamiliar with the rules of evidence. There is an adage, often attributed to Abraham Lincoln, that a man who is his own lawyer has a fool for a client. This, of course, does not mean that Ash is a fool. But it does speak, colorfully so, to the great challenge faced when representing yourself. It is extremely difficult to objectively and effectively represent yourself at your own criminal trial—even for trained lawyers. This is, in part, why *Faretta* requires trial courts to inform defendants of the dangers and disadvantages of self-representation. Telling a defendant the truth is not a constitutional violation. A court cannot adequately convey the real dangers and disadvantages of self-representation nor ensure a defendant makes the decision with eyes wide open if the court cannot tell the defendant the truth. Ash was told the truth, and then he was permitted to make his own informed decision. This cannot amount to a constitutional violation.

To conclude our application of *Faretta* to Ash, I must note that the majority also misses the mark by using an improper standard of review. The supreme court has explained the proper appellate review of *Faretta* inquiries. It said, "A reviewing court will not 'focus' on the particular 'advice rendered by the trial court,' but instead will evaluate 'the defendant's general understanding of his or her rights.'" *Hooks*, 286 So. 3d at 168 (quoting *Potts*, 718 So. 2d at 760)).

This core principle cannot be squared with today's decision. The majority inverts the proper review by focusing on the advice rendered instead of the defendant's understanding of his rights. There is nothing in this record to suggest Ash did not understand his right to self-representation. To say so is comically obvious—he repeatedly elected self-representation for two years.

*III. The Effect of Today's Decision*

I agree with the majority's sentiment that appellate courts have often been heavy handed, reversing trial courts for purported failings in informing defendants of the dangers and disadvantages of self-representation. But that's no reason to err in the other direction. The majority cites no authority, from anywhere, to support its new constitutional principle. *Noetzel v. State*, 328 So. 3d 933 (Fla. 2021) and *Woodbury v. State*, 320 So. 3d 631 (Fla. 2021) are cited, but neither stand for the majority's proposition. Both say only that additional *Faretta* inquiries were not required. There is, of course, a sea of difference between "not legally required" and reversible error.

Today's decision effectively extends the *Faretta* doctrine into uncharted territory—not only must a court *permit* self-representation, the court also must not *discourage* it. But the trial court cannot do both. It cannot avoid discouraging self-representation while also complying with *Faretta*'s command to make the defendant "aware of the dangers and disadvantages of self-representation."

*Woodbury* illustrates this point. There were over a dozen *Faretta* inquiries conducted in that case. And Woodbury repeatedly expressed frustration with the number of inquiries conducted. Unlike Ash, Woodbury objected to the inquiries two times. During a pretrial hearing, the state asked the trial court to conduct new *Faretta* inquiries on each day of trial "to perfect the record." Woodbury objected. *Woodbury*, 320 So. 3d at 639. On the second day of trial, after the state rested, the trial court began another *Faretta* inquiry. *Id.* at 640. Woodbury again objected, and declared, "I have a constitutional right to represent myself, and this has rose to the level of harassment." *Id.* The trial court responded by saying that appellate courts are:

> not as worried about practicality as they are about structural integrity of the system. So I'm going to go through them relatively quickly, you can answer them yes or no. If at any point, though, you do have a question, please let me know. So, again, I'm going to do it relatively quickly.

28

*Id.* Despite Woodbury's objections "to having to endure so many inquiries," on appeal he claimed the trial court erred in permitting self-representation. *Id.* at 645. The supreme court affirmed and noted that not all of Woodbury's *Faretta* inquiries were "legally required," but that the trial court's actions were taken "to ensure that the offer of counsel was renewed at all critical stages of the proceedings." *Id.* at 647 n.7. Rather than providing support for today's decision, *Woodbury* contradicts it.

We should speak with clarity about exactly when a *Faretta* inquiry is required, and what its content should be. But this is not clarity. Today, we muddy the water further with more textless ambiguity. In the majority's zeal to push back on one overreach, it goes too far and, I fear, makes a new and even messier mistake. If self-representing for two years and the whole of a criminal jury trial can amount to coercion against self-representation, then consider what that means for the more routine *Faretta* cases. This decision will bring under attack the many cases in which a defendant requests self-representation and then changes his mind after an appropriate *Faretta* inquiry.

### IV. Party Presentation and Anders Appeals

Finally, I must remark on the extraordinary circumstances here. This is an *Anders* appeal. The issue was neither preserved below, nor presented in the initial brief. Deciding cases this way undermines the ordinary appeal and briefing process. It also demonstrates why Florida's *Anders* procedure is at tension with our core neutral adjudicatory power. *See Anderson v. State*, 50 Fla. L. Weekly D26a (Fla. 1st DCA Dec. 18, 2024).

### A. Preservation

"From the outset, even an *Anders* appellant must still properly preserve an issue for appellate review." *Id.* Except in cases of fundamental error, appellate courts cannot reverse on unpreserved issues. *See* § 924.051(3), Fla. Stat.; *see, e.g., Washington v. State*, 328 So. 3d 364, 367–68 (Fla. 1st DCA 2021) (ordering briefing on an issue not preserved in the trial court but affirming for lack of fundamental error).

29

"[P]roper preservation requires the following three steps from a party: (1) a timely, contemporaneous objection; (2) a legal ground for the objection; and (3) '[i]n order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.'" *State v. Johnson*, 295 So. 3d 710, 714 (Fla. 2020) (alterations in original) (quoting *Fleitas v. State*, 3 So. 3d 351, 355 (Fla. 3d DCA 2008)). Ash never objected to the *Faretta* inquiries. He never asked that they not be conducted. He never asked the court to stop explaining the disadvantages of self-representation. He did no more than ask why the inquiries were repeated, and the trial court explained that the repetition was required at every crucial stage of trial. That is a far cry from an objection and preservation. We would not, and should not, hold that a lawyer's question about a legal process is sufficient to preserve an error for review and we should not treat this pro se defendant any differently.

If the unpreserved issue raised fundamental error, it may still be reviewed. *See D.H. v. Adept Cmty. Servs., Inc.*, 271 So. 3d 870, 880 (Fla. 2018). *Faretta* issues are ordinarily raised in the context of challenging the sufficiency of an inquiry, or lack thereof. In that context, the trial court's failure to conduct a proper *Faretta* inquiry is "per se reversible error." *Mosley v. State*, 349 So. 3d 861, 867 (Fla. 2022); *see also Tennis v. State*, 997 So. 2d 375, 379 (Fla. 2008) ("Under our clear precedent, and that of the district courts of appeal, the trial court's failure to hold a *Faretta* hearing in this case to determine whether [the defendant] could represent himself is per se reversible error."). But it is unclear why a violation of this newfound constitutional principle should be treated as per se or structural error. The Court's decision does not tell us. The majority makes little mention of preservation, the vehicle under which this appeal was brought, or the applicable standard of review. To the extent that the majority finds that this new principle falls within a category of per se, structural, or fundamental error, no constitutional provision, court decision, statute, or rule is cited to provide authority.

As framed by our supreme court, "[p]er se reversible errors are limited to those errors which are 'so basic to a fair trial that their infraction can never be treated as harmless error.' In other words,

those errors which are *always* harmful." *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986) (citation omitted). When considering whether fundamental error occurred, we are cautioned to exercise that discretion "very guardedly." *Ray v. State*, 403 So. 2d 956, 960 (Fla. 1981) (quoting *Sanford v. Rubin*, 237 So. 2d 134, 137 (Fla. 1970)). And "the doctrine of fundamental error should be applied only in the rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application." *Ray*, 403 So. 2d at 960. And if this new principle does not amount to fundamental error, the supreme court warned, "a defendant has no constitutional due process right to the correction of unpreserved error." *State v. Dortch*, 317 So. 3d 1074, 1081 (Fla. 2021). It noted, "'[n]o procedural principle is more familiar,' the Supreme Court has observed, 'than that a constitutional right, or a right of any other sort, may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 731 (1993)).

The issue was not properly preserved, and, absent fundamental error, preservation is a necessary precursor for appellate review. The majority fails to explain its departure from this core appellate principle.

### *B. Party Presentation*

Setting the merits of today's decision aside, we can only reverse if we first depart from our neutral, objective role as judicial adjudicators. We recently certified a question to the supreme court, asking whether Florida's *Anders* procedure aligns with the fundamental principles of appellate review. *See Anderson*, 50 Fla. L. Weekly D26a. We asked this question because, "The supreme court has recently, and repeatedly, recommitted Florida courts to the fundamental appellate principle of party presentation." *Id.* The decision today demonstrates how Florida's *Anders* procedure conflicts with our duty to remain a neutral arbiter.

Appellate defense counsel did not identify this issue for the Court to review and adjudicate in the *Anders* brief. In fact, appellate defense counsel provided a detailed brief which individually identified every *Faretta* inquiry that occurred in the

31

case. For each inquiry, counsel either commended it, discussed how thorough it was, or said it raised no legal issues. The initial brief concluded that "The record on appeal contains numerous *Nelson* and *Faretta* inquiries,--and it appears the trial court appropriately conducted those inquiries." So not only did Ash not raise this issue, his initial brief argued it was *not error*. We also permitted Ash to file a pro se brief. But he, like his counsel, never mentioned any error related to the relinquishment of his right to self-representation.

Rather than addressing the issues raised by the parties, the Court, sua sponte, raised the issue on which it now reverses. The Court ordered appellate counsel to brief the issue. Yet, even when responding to our order for supplemental briefing, Ash still argued that "his every request to self-represent was granted, in accordance with *Faretta.*"

To accomplish today's reversal, the Court has to reject counsel's professional judgment, and step into the role of counsel and advocate. And this, we are told, we must not do. *See, e.g.*, *Pinellas Cnty. v. Joiner*, 389 So. 3d 1267, 1273 n.10 (Fla. 2024) (recognizing the Court's inability to raise issues not argued by the parties or considered by the court below because of "fundamental party-presentation principles"); *Trappman v. State*, 384 So. 3d 742, 751 n.4 (Fla. 2024) ("But [Appellant] never raised this . . . issue below or in his initial brief to this Court. We do not now consider this issue that was not properly preserved or presented."); *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (explaining that "[i]n our adversarial system of adjudication, we follow the principle of party presentation" and "'in both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present'" (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008))).

As we said in *Anderson*, our *Anders* procedure sometimes leads appellate courts to "stray too far from the issues raised by the parties." *Anderson*, 50 Fla. L. Weekly D26a. The majority here has strayed too far, to the point of advocating its own basis for reversal against the professional judgment of Ash's counsel. *See D.H.*, 271 So. 3d at 888 (Canady, C.J., dissenting) ("This

requirement of specific argument and briefing is one of the most important concepts of the appellate process. Indeed, it is not the role of the appellate court to act as standby counsel for the parties."); *Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) ("[A]n appellate court [cannot] 'depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention.'" (quoting *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983))).

Breaking from appellate fundamentals, the Court reverses on a purported *Faretta* violation, despite Ash's argument that the *Faretta* inquiries were appropriately conducted in accordance with current law. This is not how *Anders* should work, and it has the effect of turning the whole appellate adjudicatory process on its head.

\* \* \*

Today's decision departs from the text, history, and tradition of the Constitution. It finds no support in the vast body of *Faretta* jurisprudence. And in the end, it will have to be corrected, by this Court or another.

_____

Jessica J. Yeary, Public Defender, and David A. Henson and Megan Long, Assistant Public Defenders, Tallahassee, for Appellant.

James Uthmeier, Attorney General, and Virginia Harris, Assistant Attorney General, Tallahassee, for Appellee.